**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2384-23

C.W.,[1]

     Appellant,

v.

NEW JERSEY STATE
PAROLE BOARD,

     Respondent.

_____

Submitted May 19, 2026 – Decided July 28, 2026

Before Judges Rose and Torregrossa-O'Connor.

On appeal from the New Jersey State Parole Board.

C.W., self-represented appellant.

Jennifer Davenport, Attorney General, attorney for respondent (Christopher Weber, Assistant Attorney General, of counsel; Christopher C. Josephson, Deputy Attorney General, on the brief).

PER CURIAM

---

[1] We use initials to protect C.W.'s privacy interests. R. 1:38-3(a)(2).

C.W. appeals from the New Jersey State Parole Board's (Board) January 31, 2024 final decision denying his parole and imposing a ninety-six-month future eligibility term (FET). He contends the Board failed to apply the proper standard to his petition or ground its decision in the record. He also raises due process violations. After reviewing the record in light of the applicable law, including the Parole Act of 1979 (the Act), N.J.S.A. 30:4-123.45 to .76, we affirm the parole denial, but vacate and remand in part, for the Board to provide a statement of reasons setting forth its legal conclusions and findings of fact for its specific FET determination in accordance with our Supreme Court's recent decision in Cowan v. New Jersey State Parole Board, 263 N.J. 91, 118-19 (2026).

## I.

After completing his thirty-year parole ineligibility term, C.W., now fifty-two years old, continues to serve a life sentence for his 1996 felony murder convictions. His convictions followed his participation with a co-defendant in a 1993 robbery during which a seventy-year-old mother and her thirty-eight-year-old son were restrained and strangled to death, and the son was stabbed. Nineteen years old at the time of this first adult conviction, C.W. pled guilty, admitting he planned with his co-defendant to rob the victims' house,

2

participated in the robbery, took money, knew both victims had been tied up, and knew their lives "were jeopardized by the actions taken inside of the house."

In March 2023, after a hearing, a two-member panel of the Board denied C.W. parole on his first eligibility date. Subsequently, an additional member joined the panel, and the three-member panel imposed a ninety-six-month FET. The Board denied his appeal of the denial and FET determinations in a lengthy written decision.

A. Panel Hearing & FET Determination

The two-member panel hearing took place on February 28, 2023 following an initial review several days earlier. The record before the panel included C.W.'s personal and criminal history, institutional history including disciplinary history and program participation, physical and mental health records[2] and evaluations, as well as an in-depth psychological risk evaluation conducted by Leo Selm, Ph.D.

---

[2] An August 22, 2022 medical report indicated C.W.'s history included "COVID-19 . . . infection"; "dysmetabolic syndrome"; "cardiomyopathy"; "CHF"; "cocaine dependence"; "alcohol dependence"; "antisocial personality disorder"; "myocardial infarction"; "obesity"; "hypertension"; arterial occlusion; "hyperopia"; "hyperlipidemia"; a cardiac stent; "suicide risk"; "toothache"; Type II diabetes; and a "history of asthma." C.W.'s niece advised by email C.W. needed a heart transplant and urged the Board to grant parole.

A-2384-23

The Selm evaluation placed C.W. as a "MODERATE RISK" for recidivism "with a 28% chance of re-arrest and a 17.1% chance of re-conviction within two . . . years of release"; "risk to re-offend [a]s MEDIUM"; and "prognosis for the successful completion of a projected length of supervision [a]s FAIR." Further, the doctor concluded the "risk for future violence is at least MODERATE and the use of drugs and alcohol will increase this risk to HIGH risk." The doctor opined C.W.'s "[j]udgment and insight" into his negative behavior and the offense "[we]re poor to fair at this time," suggesting C.W. participate in programming to address his issues. C.W.'s parole plan proposed moving to Toms River to stay with a friend and pursue carpentry, which the doctor found "feasible but in need of further investigation."

C.W.'s extensive disciplinary history while incarcerated included twenty-three infractions spanning August 1997 to August 2022.[3] The majority were

---

[3] The disciplinary record included the following: 1997 refusing to obey; 1997 possession not authorized; 1997 tattooing/self-mutilation; 1998 refusing work/accepting assignment; 1999 assault on any person with a weapon; 1999 assault on any person with a weapon; 1999 fighting with a person; 1999 giving/taking value from inmate; 1999 destroying/altering/damaging government property; 2000 conduct which disrupts; 2000 tattooing/self-mutilation; 2000 possession not authorized; 2000 in unauthorized area; 2006 possession or introduction of a weapon; 2006 refusing work/accepting assignment; 2008 failing to comply with written rules; 2009 possession not authorized; 2010 refusing work/accepting assignment; 2012 possession not

remote, and six of these infractions were designated as serious offenses. The incidents included a recent infraction in which C.W. pushed another inmate into a glass window, breaking it. In August 2022 he completed a cognitive behavioral program and a "Cage Your Rage" program addressing anger management. In records, correctional staff described C.W. as helpful and working well with others.

C.W. was afforded the opportunity to present information and testified. He described his involvement in the robbery, extensive drug use before quitting substance use "cold turkey" while incarcerated, 2012 suicide attempt, lack of formal addiction or mental health treatment, declining physical health and current age, parole plan upon release, and infraction history. He contended his youth and role in the offense, institutional history, and present circumstances mitigated in favor of his release as he presented no risk of reoffending.

In describing the crime, C.W. explained "it was supposed to be just a robbery," and when they arrived at the victims' house, he and his co-defendant tied up both victims. He recalled stealing money from the house before he "went out to start the car," and his co-defendant came out approximately five or six

---

authorized; 2012 attempting tattoo/self-mutilation; 2013 possession or introduction of narcotics paraphernalia/drugs; 2015 possession of tobacco where prohibited; and 2022 destroying/altering/damaging government property.

A-2384-23

minutes later. He maintained he "didn't know [the victims] were dead" until he found out later in "the news," but added, "I still did what I did. And it was my actions that helped kill them." C.W. explained "the knife was at the house" and "it was sitting there by the chair when [his] co-defendant stabbed [the son] in the back" while the two were "tying him up." He claimed he was unaware until he saw "blood on [his] shirt." He acknowledged both victims died by strangulation. When the panel suggested C.W. was "skipping over the part where these people g[o]t hurt," C.W. admitted that he was the one "[w]ho ransacked the bedroom and took all the money." When probed, he affirmed he "cause[d] these peoples' death" because "[i]f [he] hadn't gone that day and tied them up . . . they would still be alive today." He explained he did not think his co-defendant would "have done it by himself" and "it was definitely a lot to do with [him]."

C.W. described completing courses in "building trades" and receiving his GED. He stated there was "[n]ot really" any reason he delayed taking therapeutic programs until just before he became eligible for parole, eventually conceding "it did have something to do with parole." Acknowledging he never participated in programs or treatment related to "[his] drug addiction," C.W. indicated he would "rather just do regular programming." He explained he

began using drugs at the age of nine, but is "strong willed," and "just stopped." He also explained he was unable to enroll in programs while housed in administrative segregation for six years.

In its written decision, the two-member panel found "a substantial likelihood exists that [C.W.] would commit a new crime if released on parole at this time," applying the standard applicable to offenses before August 19, 1997. The panel cited mitigating factors, including C.W.'s "minimal offense record" and institutional program participation. Checking boxes reflecting "reasons for denial,"[4] the panel marked: "facts and circumstances of offense(s)[,] specifically[,] murder 1st degree 2 c[oun]ts"; "prior offense record"; "nature of criminal record increasingly more serious"; "committed to incarceration for multiple offenses"; "prior opportunity[] on community supervision . . . failed to deter criminal behavior"; "institutional infraction(s)" are "numerous/persistent/serious in nature"; "insufficient problem(s) resolution" including "lack of insight into criminal behavior," "minimizes conduct,"

---

[4] The panel's initial determination also listed as a reason for denial "committed new offense(s) on community supervision . . . but status not formally terminated/revoked." C.W. successfully challenged this finding, asserting he completed a term of juvenile probation on September 23, 1992, prior to committing the February 1993 offenses. Accordingly, the panel amended its evaluation to include C.W.'s juvenile history as a mitigating factor.

"substance abuse problem has not been sufficiently addressed," "terrible disciplinary history and recently pushed another inmate through a large glass window" in August 2022, "serious drug addiction [with] . . . no sufficient drug treatment"; and "risk assessment evaluation."

Because the two-member panel concluded "a [FET] within the Board's presumptive schedule may be inappropriate due to [C.W.'s] lack of satisfactory progress in reducing the likelihood of future criminal behavior," a third member joined the panel for the FET determination. Thereafter, the three-member panel issued a detailed fifteen-page decision[5] on July 5, 2023, imposing a ninety-six-month FET.

The panel described the facts of the double homicide and evidence derived from the investigation including admissions by C.W. to his involvement. The panel found "[t]he seriousness of [his] criminal record increased" with this crime following juvenile theft adjudications, noting his prior history and court intervention "failed to deter criminal behavior." Regarding C.W.'s parole plan,

---

[5] Subsequently, this determination was amended, following C.W.'s challenge, to correct the "typographical error" inaccurately indicating C.W.'s offense occurred after August 19, 1997. In amending, the Board found the panel "confirmed [C.W.] committed [his] offense on February 1, 1993" on the record at the hearing and "utilized the appropriate standard in rendering a determination," concluding disturbance of the panel's decision was not warranted based on this minor error.

A-2384-23

the panel acknowledged C.W.'s intent to stay at a friend's parents' house and his "friendship" with a priest who offered to assist him with employment and a psychiatrist who offered support. Comprehensively listing C.W.'s medical history, the Board acknowledged C.W.'s argument his health should significantly factor into the release determination. The panel, however, raised mental health and substance abuse concerns, noting C.W. had never participated in substance abuse treatment despite the severity of his addiction at the time of the offenses.

The panel reviewed C.W.'s extensive infraction history, emphasizing his 2022 infraction "involv[ing C.W.] pushing another inmate who fell into a window, breaking it." The panel noted C.W. characterized this conduct as "horseplay," stating he "shouldn't have been playing."

Identifying C.W.'s "insufficient problem resolution," the panel cited his testimony that "[his] actions . . . helped kill the[]" victims of the robbery; "the knife was at the house" and "sitting by the chair when [his] co-defendant stabbed [one victim] in the back"; he "wasn't in the house" and "was really outside" during the murders; he was unaware of the stabbing until he "s[aw] blood on [his] shirt"; he learned of the deaths "a couple days later" and "thought [they] had got away with the robbery"; and he did not think his co-defendant could

have committed the crime alone as "[i]t was a lot to do with [him]." The panel further noted C.W. admitted he completed only two "cognitive and behavioral programming" courses in 2022 which "ha[d] something to do with parole"; claimed to be sober since 2009; and was no longer gang affiliated.

The three-member panel concluded C.W. was "in the beginning stages of gaining insight into [his] criminal thinking and why [he] tend[s] to minimize [his] negative conduct," explaining its view C.W. "walked a fine line of deflecting accountability for the murders onto [his] co-defendant but then countering the deflecting with . . . taking responsibility for [his] participation in the crime" and his statements of accountability "came across as compulsory and obligatory." Further, the panel found there was "no real reason why substantive programming did not play a larger role during [his] incarceration" and it appeared he recently completed two behavioral programs "due to the optics of [his] upcoming parole hearing." It then explained C.W.'s history of institutional infractions, concluding his "explain[ing] away, mitigat[ing] and deflect[ing] responsibility" in all infractions evidenced "[a] lack of full awareness to [his] negative behavior." It characterized C.W.'s admission regarding his suicide attempt as contrary to his denial about having mental health issues.

In establishing the ninety-six-month FET, the panel concluded C.W. "need[ed] to develop increased insight into [the] negative thinking" and "personality defects" that led to his committing the offense and adversely affected him during incarceration, as he committed numerous infractions. The panel found C.W. should complete additional programming and counseling related to his anger, abandonment, and substance abuse issues finding his current effort unimpressive, as demonstrated by his lengthy disciplinary history.

B. Appeal to the Board

C.W. appealed to the full Board, arguing the panel neglected to "consider material facts," such as his age and health, citing recent case law recognizing "advanced age" as a "highly relevant factor" in parole determinations. See Berta v. N.J. State Parole Bd., 473 N.J. Super. 284, 321-22 (App. Div. 2022) (quoting Acoli v. N.J. State Parole Bd., 250 N.J. 431, 469-70 (2022)) (recognizing "[s]tudies have shown that as individuals age, their propensity to commit crime decreases and, in particular, that elderly individuals released from prison tend to recidivate at extremely low rates"). C.W. specifically asserted, "the three-member Board Panel totally disregarded not advanced age as in Berta but the excessive amount of health issues and the recidivism-studies demonstrating that the possibility of hi[s] committing another crime if released is almost none." He

A-2384-23

further argued the Board panel failed to "document" its conclusions pursuant to the appropriate standard. He alleged due process and constitutional violations based on the panel's misapplication of the standard, challenged the relevance of prior institutional infractions as well as the propriety of the panel's classification of the robbery as "multiple offenses," and contended his FET exceeded legal guidelines, citing a now-repealed 2009 amendment to N.J.S.A. 30:4-123.56, and should be reduced.

By final decision dated January 31, 2024, the Board unanimously affirmed the panels' determinations "concur[ring] . . . that a preponderance of evidence indicate[d] that there is a substantial likelihood that [he] would commit a crime if released on parole at this time" and the reasons set forth for establishing the ninety-six-month FET. The Board found the panel "considered the aggregate of information pursuant to N.J.A.C. 10A:71-3.11 and fully documented and supported its decision pursuant to N.J.A.C. 10A:71-3.18(f)."

The Board rejected each of C.W.'s claims, finding the panel properly concluded "parole release [wa]s not appropriate at th[at] time." Specifically, the Board found no merit in his claims the panel failed to consider material facts, violated written policy, or did not document the reasons for denial, citing C.W.'s

failure to identify overlooked facts or policies and the panel's "sufficiently documented" reasons.

The Board similarly rejected C.W.'s due process violation allegation noting the panel "den[ied] parole [based] on the factors set forth in the statutory requirements and N.J.A.C. 10A:71-3.11." Recognizing C.W.'s arguments regarding the significant correlation between advanced age and diminishing health and criminal recidivism, the Board concluded the panel considered C.W.'s "medical issues," determining they "d[id] not necessitate [his] release." It also deemed the panel's questioning "appropriate" and determined the panel "carefully and thoroughly reviewed all the reports . . . [and] information in the administrative record." It rejected the contention the panel "incorrectly noted [C.W. was] presently incarcerated for a multi[-]crime conviction" as C.W. pled to "multiple counts contained in one indictment." The Board clarified as of "May 9, 2011, there no longer exist[ed] a restriction on the length of a [FET] that may be imposed upon the denial of parole."

The Board found "without merit" C.W.'s claim the panel improperly considered his institutional disciplinary history as the panel's "responsibility [is] to consider [the] commission of serious disciplinary infractions, [the] adjustment to incarceration and [the] pattern of less serious disciplinary

13

infractions . . . to determine . . . suitability for parole." On this point, it observed he committed twenty-three infractions—six "serious."

Finally, the Board agreed C.W.'s "lack of satisfactory progress in reducing future criminal behavior" and extensive disciplinary history warranted the ninety-six-month FET. It highlighted the following:

> after three . . . decades of incarceration, [C.W.] need[s] to develop increased insight into [his] negative thinking that led to [his] participation in the present offense and affected [him] negatively during [his] incarceration; [he] completed only two . . . programs related to cognitive or behavior issues, Cage Your Rage and Thinking for a Change in 2022. There are clearly and admittedly issues from [his] past that need to be analyzed by [him] and addressed with substantive counseling; and [he] ha[s] committed twenty-three . . . infractions with six . . . of a serious nature.

The Board recommended further participation in substance abuse and decision-making programs to address these issues.

The appeal followed. C.W. reprises his arguments and contends the Board's decision was arbitrary and capricious, claiming the Board applied the incorrect standard, reached findings not rooted in the record, overlooked vital factors, and denied him due process safeguards.

14

II.

A.

"Appellate 'review of administrative agency action is limited.'" Cowan, 263 N.J. at 105 (quoting Russo v. Bd. of Trs., PFRS, 206 N.J. 14, 27 (2011)). We "apply a deferential standard to final agency actions and will not overturn them unless an action is arbitrary, capricious, or unreasonable." Ibid. (alteration in original) (quoting In re Att'y Gen. Law Enf't Directive Nos. 2020-5 & 2020-6, 246 N.J. 462, 489 (2021)). In making this determination, we consider

> (1) whether the agency's action violates express or implied legislative policies, i.e., did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Trantino v. N.J. State Parole Bd., 154 N.J. 19, 24 (1998) (quoting Brady v. Dep't of Pers., 149 N.J. 244, 256 (1997)).]

Those challenging agency decisions retain "[t]he burden of showing that an action was arbitrary, unreasonable or capricious." McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002).

We recognize the Board makes "highly individualized discretionary appraisals," Cowan, 263 N.J. at 105 (quoting Trantino v. N.J. State Parole Bd.,

15

166 N.J. 113, 173 (2001)) (internal quotation marks omitted), and the Board has "expertise in the specialized area of parole," J.I. v. N.J. State Parole Bd., 228 N.J. 204, 230 (2017). Only "when a parole decision is so far wide of the mark or so manifestly mistaken under the governing statutory standard[ is] intervention . . . required in the interests of justice." Acoli, 250 N.J. at 455. "A mere difference of opinion" will not warrant our interference. Id. at 454.

As C.W.'s prison term resulted from his 1993 offense, his parole is governed by the 1979 version of the Act in effect at that time. See Berta, 473 N.J. Super. at 304 (recognizing parole "is governed by the version of the Parole Act . . . in effect when [the] crime was committed"); see also Cowan, 263 N.J. at 108 (advising the 1979 version of the Act controls for offenses committed "before the 1997 amendments to the . . . Act"). The applicable law at the time of C.W.'s offense, provided in pertinent part:

> An adult inmate shall be released on parole at the time of parole eligibility, unless information supplied in the report filed pursuant to section 10 of this act or developed or produced at a hearing held pursuant to section 11 of this act indicates by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime under the laws of this State if released on parole at such time. In reaching such determination, the board panel or board shall state on the record the reasons therefor.
>
> [N.J.S.A. 30:4-123.53(a) (1993) (emphasis added).]

16

"Substantial likelihood" "is a fairly high predictive bar that must be vaulted [by the Board] -- even though such an assessment will defy scientific rigor and involves a certain degree of subjectivity." Acoli, 250 N.J. at 455-56 (recognizing "likelihood" to mean "'probability,' or 'the appearance of probable success,' and 'substantial' . . . as 'considerable in amount' or 'being that specified to a large degree'" (quoting Webster's Third Int'l Dictionary 1310, 2280 (1981))). Stated simply, "[a]ssessing the risk that a parole-eligible candidate will reoffend requires a finding that is more than a mere probability and considerably less than a certainty." Id. at 456. The risk of reoffense must "rise[] to 'a substantial likelihood'" to warrant denial—"mere 'potential' that an inmate if released may reoffend is not sufficient." Ibid. (quoting State Parole Bd. v. Cestari, 224 N.J. Super. 534, 550 (App. Div. 1988)).

In making its determination, the Board considers "the aggregate of all pertinent factors"[6] and provided materials. N.J.A.C. 10A:71-3.11; see also

_____

[6] The N.J.A.C. 10A:71-3.11(b) factors are: (1) commission of an offense while incarcerated; (2) commission of serious disciplinary infractions; (3) nature and pattern of previous convictions; (4) adjustment to previous probation, parole and incarceration; (5) facts and circumstances of the offense; (6) aggravating and mitigating factors surrounding the offense; (7) pattern of less serious disciplinary infractions; (8) participation in institutional programs which could have led to the improvement of problems diagnosed at admission or during incarceration; (9) statements by institutional staff, with supporting

<u>Cowan</u>, 263 N.J. at 109. "The weight to be assigned to any one factor will depend on the unique history, background, and characteristics of the individual and the institutional record developed during years of incarceration." <u>Acoli</u>, 250 N.J. at 457. "An inmate's progress or lack of progress toward rehabilitation is relevant only to the extent it bears on whether there is a substantial likelihood that he will reoffend if released." <u>Ibid.</u> (quoting <u>In re Application of Trantino</u> (<u>Trantino II</u>), 89 N.J. 347, 373-74 (1982)).

documentation, that the inmate is likely to commit a crime if released, that the inmate has failed to cooperate in his or her own rehabilitation; or that there is a reasonable expectation that the inmate will violate conditions of parole; (10) documented pattern or relationships with institutional staff or inmates; (11) documented changes in attitude toward self or others; (12) documentation reflecting personal goals, personal strengths or motivation for law-abiding behavior; (13) mental and emotional health; (14) parole plans and the investigation thereof; (15) status of family or marital relationships at the time of eligibility; (16) availability of community resources or support services for inmates who have a demonstrated need for same; (17) statements by the inmate reflecting on the likelihood that he or she will commit another crime; the failure to cooperate in his or her own rehabilitation; or the reasonable expectation that he or she will violate conditions of parole; (18) history of employment, education and military service; (19) family and marital history; (20) statement by the court reflecting the reasons for the sentence imposed; (21) statements or evidence presented by the appropriate prosecutor's office, the Office of the Attorney General, or any other criminal justice agency; (22) statement or testimony of any victim or the nearest relative(s) of a murder/manslaughter victim; (23) the results of the objective risk assessment instrument; and (24) subsequent growth and increased maturity of the inmate during incarceration.

Critically, "the parole release decision is fundamentally different from the decision made by a trial court when imposing the initial sentence." Berta, 473 N.J. Super. at 305. Although the circumstances of the underlying offense are relevant under N.J.A.C. 10A:71-3.11(b)(5), "'the gravity of the crime' cannot serve as 'an independent reason for continuing punishment and denying parole' under the [Parole] Act." Ibid. (quoting Trantino II, 89 N.J. at 373-74). "That is because the punitive aspects of the sentence have been satisfied by the time an inmate is eligible for parole." Acoli, 250 N.J. at 457.

B.

We preliminarily reject C.W.'s claim the Board applied the wrong standard. The two-member panel identified and applied the 1979 standard to C.W.'s parole evaluation. The Board's final decision expressly confirmed a "preponderance of evidence indicate[d] that there is a substantial likelihood C.W. would commit a crime if released." We are satisfied the Board made its determination under the controlling legal standard.

We next consider C.W.'s due process challenge in which he invokes the doctrine of fundamental fairness and asserts the Board violated his rights to a "fair hearing"; "present fact-witnesses"; "a complete defense"; and "a decision that was not fundamentally flawed." He fails to elaborate on the alleged

19

deprivation, and our review of the record convinces us C.W. was afforded the process he was due.

"[D]ue process is a dynamic concept," which "cannot be imprisoned in a crystal." N.J. State Parole Bd. v. Byrne, 93 N.J. 192, 209 (1983) (quoting Callen v. Sherman's Inc., 92 N.J. 114, 134, 136 (1983)). In initial parole determinations, only "notice of the pendency of the parole disposition" and "the opportunity for the prisoner to respond" are required. Id. at 211. Fundamental fairness is "an integral part of due process." State v. Saavedra, 222 N.J. 39, 67 (2015); see also State v. Abbati, 99 N.J. 418, 429 (1985). The doctrine, used "sparingly," "serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily," Doe v. Poritz, 142 N.J. 1, 108 (1995) (quoting State v. Ramseur,106 N.J. 123, 377 (1987) (Handler, J., dissenting)), and applies only to "those rare cases where government action does not comport with 'commonly accepted standards of decency of conduct to which government must adhere,'" State v. Black, 153 N.J. 438, 455 (1998) (quoting State v. P.Z., 152 N.J. 86, 117 (1997)) (concluding a "defendant's parole revocation and his absconding conviction d[id] not justify application of New Jersey's fundamental fairness doctrine").

Here, C.W. received notice and multiple opportunities to be heard spanning an initial hearing, a subsequent formal hearing, multiple rounds of extensive briefing, a separate FET determination, and an appeal to the full Board. The record is devoid of any suggestion the Board limited C.W.'s presentation of fact witnesses or the completeness of his argument. Further, the decisions at each juncture thoroughly detailed the record, including C.W.'s testimony. Contrary to C.W.'s claims, we are satisfied the Board's determination considered his age and health characteristics, finding those considerations did not outweigh the risks of his release at this time. Thus, we perceive no due process violation or basis for relief under the fundamental fairness doctrine.

Turning to C.W.'s substantive claims the Board abused its discretion in denying parole, we are unpersuaded. C.W. alleges the Board's "decision was not based on or supported by the facts nor was it supported by 'substantial credible evidence.'" He argues the Board mischaracterized his 2022 infraction as intentional; did not adequately consider "age and discrimination studies" or that he "continues to be an asset to the facility in spite of his many health issues"; failed to explain why a "refusal to acknowledge his guilt translate[d] into a substantial likelihood that he would re-offend"; placed undue emphasis on the

seriousness of the offense; improperly double counted aggravating factors;[7] and engaged in "borderline unethical" questioning designed to elicit a confession to "actual murder" and undue skepticism regarding his "parole plans, intentions, [and] his possible immersion in future criminal behavior."

Our review of the record persuades us otherwise. We are satisfied the Board considered the appropriate factors under the correct standard and supported the parole denial with credible evidence in the record.

The Board fairly considered C.W.'s institutional history, which included an extensive disciplinary history and an infraction of recent vintage of specific concern for parole purposes. It explained its concern over the duration and nature of C.W.'s disciplinary record, and we defer to its expertise in weighing the gravity and import of his past conduct. We discern no error.

The Board also acknowledged C.W.'s recent completion of some behavioral programming, but reasonably noted its proximity to his parole review and fairly determined the efforts to address his conduct were new and insufficient to sufficiently impact concerns regarding his release. In particular,

---

[7] C.W. offers no further explanation for this assertion. Thus, we cannot discern how and what the Board allegedly double counted and deem this issue waived as inadequately briefed. S. Jersey Catholic Sch. Tchrs. Org. v. St. Teresa of the Infant Jesus Church Elementary Sch., 150 N.J. 575, 598 (1997) ("Issues that are raised but are not supported with arguments are deemed waived.").

the Board determined the absence of behavioral and substance abuse programming contributed substantially to the risk of future criminal activity. Indeed, the Board properly considered the extent to which C.W. participated in substance abuse treatment, if at all, particularly given his addiction history and its role in the offenses. See Hare v. N.J. State Parole Bd., 368 N.J. Super. 175, 180-81 (App. Div. 2004).

We do not view the record as supporting C.W.'s argument the Board improperly weighed the nature of the offenses or demanded an admission of guilt beyond his acceptance of responsibility for his role in the double homicide. Mindful the Board may not rely upon the gravity of the offense to independently warrant parole denial, see Acoli, 250 N.J. at 457, we do not discern the Board inappropriately weighed the nature of the offense.

Nor do we conclude it erroneously mandated a confession to a more nefarious intent or additional heinous conduct or penalized C.W. for "asserting his innocence." See Berta, 473 N.J. Super. at 318-19. To the extent the Board identified minimization on C.W.'s part, it sufficiently tethered that finding to its expressed legitimate concern C.W. had not adequately addressed his behavioral and substance issues and presented a substantial risk of reoffending.

A-2384-23

Unlike the situation in Berta, in which parole was denied due to "insufficient problem resolution" despite no history of substance abuse, multiple "low-risk" psychological evaluations, active participation in many institutional programs, and a minor institutional disciplinary history, 473 N.J. Super. at 292-95, 318-19, the record here warranted the Board's concerns C.W. had not adequately addressed the circumstances leading him to offend. As the Board recognized, C.W.'s serious substance abuse issues, never formally or therapeutically addressed, led to his participation in the robbery, and he was evaluated as moderate risk of reoffense and future violence—rising to high should there be substance abuse. The record demonstrates the Board's finding of "insufficient problem resolution" was rooted in many factors, not merely C.W.'s perceived minimization.

Indeed, the Board determined C.W. "walked a fine line of deflecting accountability" and "taking responsibility for [his] participation in the crime" which appeared "compulsory and obligatory." We defer to these findings in light of the Board's particular expertise. See J.I., 228 N.J. at 230. The record as a whole convinces us the Board properly concluded C.W. presented a substantial risk of reoffending and denied C.W. parole.

C.

C.W. next challenges the Board's FET determination. When denying parole, a two-member panel must establish an FET. N.J.A.C. 10A:71-3.21(a). Relevant here, "a prison inmate serving a sentence for murder . . . shall serve 27 additional months," N.J.A.C. 10A:71-3.21(a)(1), which "may be increased . . . by up to nine months when, in the opinion of the [two-member] Board panel, the severity of the crime for which the inmate was denied parole and the prior criminal record or other characteristics of the inmate warrant such adjustment," N.J.A.C. 10A:71-3.21(c). If that FET determination "is clearly inappropriate due to the inmate's lack of satisfactory progress in reducing the likelihood of future criminal behavior," then "[a] three-member Board panel may establish a future parole eligibility date which differs." N.J.A.C. 10A:71-3.21(d). After a "review of all records of the panel hearing," the three-member panel must then commit its reasons to writing. N.J.A.C. 10A:71-3.21(d)(4) and (8).

Specifically, the Board "in setting an FET pursuant to N.J.A.C. 10A:71-3.21(d) beyond the presumptive term and the allowable nine-month increase, must: (1) overcome the presumption by explaining why the applicable presumptive term is clearly inappropriate; and (2) explain why the imposed FET

25

is necessary and appropriate." Cowan, 263 N.J. at 118. The presumptive term is "not to be dispensed with for light or transient reasons." Ibid. (quoting Berta, 473 N.J. Super. at 322-23). "Further, as noted in N.J.A.C. 10A:71-3.21(d), the Board shall consider the factors enumerated in N.J.A.C. 10A:71-3.11(b) in making its determination to impose an extended FET." Id. at 119.

Importantly, the Board must also ensure the extended FET "is no longer than necessary to address what the Board perceives at the time to be 'the inmate's lack of satisfactory progress in reducing the likelihood of future criminal behavior.'" Id. at 119 (quoting N.J.A.C. 10A:71-3.21(d)). "[A]n extended FET must be based on substantial credible evidence in the record that objectively demonstrates that its duration directly relates to the amount of time necessary to address the reasons identified for denying parole." Ibid. (quoting Berta, 473 N.J. Super. at 328 (Geiger, J.A.D., concurring)). Here, under the controlling version of the Act, "the Board must relate the FET duration to" the "risk of recidivism" and "[s]ubstantial weight should be given to the risk assessment as it is an objective measure of an inmate's likelihood of re-offending." Ibid.

In its fifteen-page decision, the three-member panel made findings as to each parole factor and explored in detail C.W.'s "insufficient problem resolution." In determining "the factors supporting the denial of parole,

26

collectively, [we]re of such a serious nature as to warrant the setting of a [FET] which differs from the presumptive term," the Board emphasized C.W.'s lack of "insight into [his] negative thinking" and "personality defects," which contributed to his participation in the robbery and negatively impacted him during incarceration, lackluster participation in cognitive or substance abuse programming, and extensive institutional infraction history. The Board then concluded an extended FET beyond the presumptive term was warranted, arriving at ninety-six months without further elaboration on the basis for that specific term.

We are mindful it is not our province to substitute our judgment for the expertise of the Board. We further recognize the Board did not have the benefit of our Supreme Court's decision in Cowan when it issued its decision here. However, our deference is conditioned upon the Board's sufficiently detailing its findings and conclusions in accordance with controlling law. See N.J.S.A. 52:14B-10(d) (a final decision must "include findings of fact and conclusions of law, separately stated and . . . based only upon the evidence of record at the hearing"). "Where the agency record is insufficient, we may order a remand to the agency to more fully develop the record." ACLU of N.J. v. Hendricks, 233

N.J. 181, 201 (2018); see also Noble Oil Co. v. Dep't of Env't Prot., 123 N.J. 474, 475 (1991).

Based on our assessment of the Board's final decision adopting the three-member panel's FET determination, we cannot be assured the FET is not "longer than necessary"; "directly relate[d] to the amount of time necessary to address the reasons identified for denying parole"; and related to C.W.'s risk of recidivism, see Cowan, 263 N.J. at 118-19. We are thus constrained to remand for further consideration of the appropriate FET term, as we cannot evaluate the soundness of the Board's discretion in the absence of these explicit findings. On remand, the Board shall consider, identify, and explain, with particular reference to the record, its determination of the particular FET duration it determines necessary to address C.W.'s risk of recidivism. See ibid. We do not suggest the outcome or restrict the Board's ability to consider and recalculate C.W.'s FET.

To the extent we have not addressed any additional arguments raised by C.W., we determine they lack sufficient merit to warrant further discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Affirmed in part, vacated and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hasley

Clerk of the Appellate Division